**UNITED STATES of America,**

v.

**Daniel LEVETO, Defendant.**

**No. CRIM. 01–6(1).**

United States District Court,
W.D. Pennsylvania.

Nov. 2, 2004.

John J. Mead, Scarpitti & Mead Law Firm, Erie, PA, for Daniel Leveto.

Thomas G. Voracek, Rita Genetti Calvin, U.S. Department of Justice Tax Division, Washington, DC, for United States of America.

## OPINION

COHILL, Senior District Judge.

Presently before the Court is defendant's "Motion to Suppress Evidence" (Doc. 59), the Government's response thereto ("Government's Omnibus Response to Defendant Daniel Leveto's Pre–Trial Motions") (Doc. 68) and defendant's reply. (Doc. 69). The court held a suppression hearing on October 28, 2004; we orally denied the motion to suppress at the conclusion of the hearing, stating a brief synopsis of the reasons for our denial of the motion to suppress. The purpose of this

opinion is to explain in more detail the basis for our denial of the motion to suppress.

## I. BACKGROUND

The following facts are not in dispute. On February 15, 2001, a grand jury returned a five count indictment against Daniel Leveto, Margaret Leveto, and Donald Turner, a/k/a Don Wood, filed at Crim. No. 01–06 Erie. Count I charges all three defendants with conspiracy to defraud the United States from August 1991 through May 23, 1997, in violation of 18 U.S.C. § 371. Counts II and III charge Daniel Leveto with willful subscription to a false federal income tax return on April 15, 1995 and April 15, 1996, respectively, in violation of 26 U.S.C. § 7206(1). Counts IV and V charge defendant Margaret Leveto with willful subscription to a false federal income tax return on April 15, 1995 and April 15, 1996, respectively, also in violation of 26 U.S.C. § 7206(1). Upon Leveto's failure to appear at his arraignment, an arrest warrant was issued on December 28, 2001. Leveto was not arrested until March 17, 2004; he was found in the Northern District of Ohio. He was subsequently transferred to the Western District of Pennsylvania, Erie Division, making his initial appearance before the magistrate judge on April 1, 2004. Leveto pleaded not guilty[1] as to all three counts against him and has been detained pending trial. At the conclusion of a hearing on the issue of waiver of right to counsel, he was granted permission to represent himself; stand-by counsel was appointed. Stand-by counsel was present at the suppression hearing.

Leveto was a veterinarian who practiced out of the Langdon and Leveto Veterinary Hospital at 316 Conneaut Lake Road, Meadville, Pennsylvania. Dr. Leveto was the main target of an undercover operation that began in December of 1994. Pursuant to a search warrant authorized by a U.S. Magistrate Judge, the IRS searched the Leveto business and residence on May 2, 1996. Leveto challenges the validity of the search warrant.

On May 1, 1996, IRS Special Agent Robert A. Lapina,[2] who at that time had nearly nine years' experience in the IRS's Criminal Investigation Division ("IRS–CID"), submitted a 27 page, signed affidavit ("Lapina Affidavit") to Magistrate Judge Susan Paradise Baxter, explaining the history of the IRS–CID's still-ongoing investigation into possible tax evasion by Dr. Leveto. The Lapina Affidavit is attached to the Government's Omnibus Response to Defendant Daniel Leveto's Pre–Trial Motions (Doc. 68) as Attachment D. According to the affidavit, Dr. Leveto and his co-defendant wife, Margaret A. Leveto, filed joint federal income tax returns. The Levetos were suspected of willfully attempting to evade personal income tax liabilities, in violation of 26 U.S.C. § 7201, willfully making materially false income tax returns for the years 1991 through 1994, in violation of 26 U.S.C. § 7206(1), and conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

Included in the Lapina Affidavit is a description of a book entitled "Tax Free,

---

**1.** Co-defendant Margaret Leveto entered a plea of guilty as to Count One of an Information filed at Crim No. 04–31 E with the understanding that upon completion of her cooperation, her name will be withdrawn from this case at the time of sentencing; co-defendant Turner remains at large.

**2.** Lapina is now an Assistant Special Agent in Charge of the U.S. Postal Service–Office of Inspector General.

How the Super Rich Do It", written by Don Turner, also a target of the investigation, who previously served 18 months in prison for income tax related violations. Dr. Leveto stated to a confidential informant that he (Dr. Leveto) was the only individual in the United States who was marketing this publication. He promoted the book to one confidential informant and to the undercover agent, and later sold a copy of this book to the undercover agent. The book advocates the use of "colatos", which stands for (c)ommon (l)aw (t)rust (o)rganizations, and advises that individuals can sell their business to a foreign "colato" and then receive the profits from this business in the form of non-income sources. The foreign "colato" is responsible for filing a 1040 Non–Resident Alien federal income tax return ("1040NR"). Instead of paying tax on the profits, the foreign "colato" can elect to distribute these profits to another foreign "colato", thereby converting income earned in the United States to foreign source income.

The IRS apparently had reason to suspect that Dr. Leveto, possibly with the help of Mr. Turner, was practicing the tax-evasion techniques espoused in this publication. For example, the undercover agent had numerous conversations with Dr. Leveto about how to go about setting up a "foreign colato." These conversations are detailed in the Lapina Affidavit. According to the Lapina Affidavit, Dr. Leveto also explained to a confidential informant that Dr. Leveto became involved in an "association" which could help the confidential informant reduce and/or eliminate paying income taxes. Dr. Leveto explained that once he (Dr. Leveto) joined the "association," he sold his business to either a person or organization, outside the United States. Leveto told the confidential informant that since the business was sold, he received only wages from this foreign individual/entity when in reality he still controlled all of the gross receipts of the veterinarian business. Leveto told the confidential informant that as a result of this, he pays only as much tax as he wants to. On another occasion, Dr. Leveto stated to a confidential informant that he pays only what he considers to be his "fair share" of taxes.

In addition, the IRS learned that sometime in 1993, a certain advertisement was placed in the *Wall Street Journal,* entitled "Hot New Report Reveals A Unique Way to Legally Pay Zero Taxes and Totally Eliminate Lawsuits." Anyone interested in responding to this advertisement was directed to write to Center Company, Daniel Leveto VMD, GM, 316 Conneaut Lake Road, Meadville, Pennsylvania. This is the same address as Dr. Leveto's veterinarian business. The same advertisement was found in the November 20, 1995 issue of *The Spotlight* weekly newspaper, with interested parties instructed to write to the same address described *supra.*

According to the Lapina Affidavit, and consistent with Dr. Leveto's statements to the confidential informant, Leveto had sold the veterinarian business to an entity named Center Company on July 31, 1991. Center Company filed nonresident alien income tax returns for the years 1991 and 1992, postmarked from the Turks and Caicos Islands, British West Indies. Both the 1991 and 1992 1040NRs reflect that all income was distributed to a beneficiary, resulting in Center Company having no total, adjusted, or taxable income.

In 1991, the Levetos reported $87,792 in taxable income. In 1992, 1993 and 1994 the Levetos reported zero taxable income. The Lapina Affidavit details various expenditures by the Levetos, including extravagant vacations and the purchases of airplanes and cars. Leveto made admissions to the confidential informant and to

the undercover agent reflecting the fact that he was involved in nothing more than a "charade or sham." Special Agent Lapina stated that Dr. Leveto was "well aware he can dictate whatever taxable income he desires and then disguise the balance of funds he receives as non-income sources utilizing 'debit cards' and a 'line of credit', which he termed as a 'paper tiger.'" Lapina Affidavit at ¶ 22.

Special Agent Lapina explained in his affidavit that it has been his experience that in order to determine an individual's correct taxable income, indirect methods of proof must be utilized, including documentation of assets, liabilities and expenditures. Such financial records are typically kept at business locations and residences. Lapina Aff. ¶ 5. The confidential informants, one-time friends of the Levetos, were able to pinpoint the likely locations of such financial records. They described the Leveto residence as having a home office with a computer, file cabinet and safe. Mrs. Leveto had explained to one confidential informant that her husband used the home computer for buying and selling commodities. She also explained that Dr. Leveto had a computer at work as well, which he used for this same activity. During the course of meetings with the undercover agent, Dr. Leveto admitted that he had evidence of assets placed in a nominee name as well as instructions on how "this whole process can be unwound", located in a safe. One confidential witness had seen a free standing safe in the Leveto home. Lapina Affidavit ¶ 27.

The IRS conducted covert mail cover operations on the Leveto residence and business from December 194 through July 1995. It learned that correspondence and information concerning assets, liabilities and financial accounts was being delivered to both addresses. Such correspondence included replies to Leveto's advertisement relative to Don Turner's publication, as well as from alleged nominee names of companies over which Leveto exercised control.

The Lapina Affidavit specifically mentions allegations of willfully attempting to evade personal income tax liabilities and/or willfully making and subscribing to materially false income tax returns for each of the years 1991, 1992, 1993, and 1994, in violation of Title 26 U.S.C. §§ 7201 and/or 7206(1). It also alleges probable cause that Daniel Leveto and Don Turner were and continue to be involved in a conspiracy to evade Leveto's and other individuals' income tax liabilities and/or willfully making or subscribing to materially false income tax returns, in violation of Title 18, U.S.C. § 371. However, the warrants reference alleged violations of 18 U.S.C. § 371, but do not refer to 26 U.S.C. §§ 7201 or 7206(1).

The Lapina Affidavit also explained that the search would target widespread financial documentation:

> ... in order to determine an individual's correct taxable income ... indirect methods of proof have to be utilized, in order to evidence the crime of tax evasion. These indirect investigative techniques require documentation of assets, liabilities, and personal expenditures. Your affiant's experience, time and time again, has been that individuals keep financial records, of one nature or another, of their assets, liabilities, and personal expenditures at either their business locations or residences.

Lapina Affidavit ¶ 5.

As a result of the Lapina Affidavit, the magistrate found that probable cause existed to search plaintiff's home and business for evidence of tax law violations. She signed both warrants on May 1, 1996. On motion of the Assistant United States Attorney, who desired to protect the iden-

tity of the witnesses, the magistrate judge signed and sealed the Application and Lapina Affidavit on the same date. Agent Lapina has stated the he provided his affidavit to the magistrate judge for her review and discussion during his submission of the warrants to her. Attachment E to the Government's Omnibus Response to Defendant Daniel Leveto's Pre–Trial Motions (Doc. 68). The searches were authorized and took place the next day, May 2, 1996. The warrants are attached as Attachments A and B to the Government's Omnibus Response to Defendant Daniel Leveto's Pre–Trial Motions (Doc. 68). A descriptive list of items to be seized appears as Attachment C to the government's response brief, and were attached to the search warrants and incorporated therein by reference. The face of the warrant does not expressly incorporate by reference the affidavit.

Agent Lapina was a very credible witness. He testified that in the days prior to the search and prior to his affidavit being sealed, he had circulated drafts of the affidavit to his search team members, and that the team leaders had copies of the draft affidavit during the execution of the search. In an affidavit dated August 10, 2004, as well as at the suppression hearing, Agent Lapina explained that on May 1, 1996, the day before the search but after the issuance of the warrant, he met with the IRS agents; all IRS agents present at the search were also present at the May 1, 1996 meeting. At the pre-search meeting, Lapina discussed the parameters of the searches, the agents were provided with a copy of the warrant for the location which he or she had been assigned to search, they were given a list of items to be seized, and an execution plan was communicated. He also gave them a synopsis of the overall investigation "so as to provide them with an understanding of the alleged fraudulent activity and applicable statutes (26 U.S.C. Section 7201 and 7206(1), as well as 18 U.S.C. Section 371)." Agent Lapina has explained that he described details regarding the identities of the "known co-conspirators and associates of Daniel Leveto," details regarding alleged known nominee names and entities such as Center Company, and details regarding the potential existence of foreign bank accounts and foreign trusts. The agents were also informed of the timeframe of the search, that the tax violations were believed to be ongoing and that it may be necessary to seize financial evidence dating back to the late 1980s to reconstruct a correct taxable income based upon indirect method of proof. Attachment E to the Government's Omnibus Response to Defendant Daniel Leveto's Pre–Trial Motions (Doc. 68) at ¶¶ 6, 7.

On the day of the search, the IRS arrived at the veterinarian business around 6:20 a.m. A second search team waited near the Leveto residence and was under instructions to await further go-ahead from Agent Lapina, who had concluded after surveillance that the Leveto children ordinarily left the home for school around 8:00 a.m. The agents read Dr. Leveto his non-custodial rights.

When Leveto first arrived at the business, Lapina identified himself and the other agents, stated the purpose of the search, and gave Leveto copies of the warrants and the items to be seized from the home and business. He and special agent Adams discussed the search with Leveto at length, and Leveto does not contest that he was compliant with the search that day. At Leveto's request, Lapina, Adams, and other agents escorted Leveto to his residence at a point in time after the children had left the house, at which time Leveto explained to his wife the nature of the search which was about to be conducted at the residence. Dr. Leveto requested that

a police cruiser be removed from the area of the home, and Lapina complied with this request.

Dr. Leveto then returned with the agents to his business and was interviewed for several hours. At Dr. Leveto's request, the interview was terminated around 2 or 2:30 p.m. During the execution of the search, the agents collected documents, catalogued them according to their designated locations, and created a computerized inventory which was printed out and handed to Dr. Leveto at the end of the search. Although Agent Lapina did not participate in the search, he was available to answer questions from the seizing agents regarding the scope of the warrants. The Levetos were also given a detailed inventory of those items which were actually seized from the business and home. Dr. Leveto was not given a copy of the Application and Lapina Affidavit, because they had been sealed. *Id.*

The executing agents took considered steps to minimize the upheaval to the business. Dr. Leveto's business was closed from the early morning until around 2:30 p.m. In the morning some agents helped the employees place phone calls to reschedule appointments for later in the afternoon and also made referrals for emergency situations. The bulk of the search was completed by 2:30 but Agent Lapina and one other agent remained behind to download and copy computer files, rather than remove the computer systems, in order to allow the business to operate. The downloading was finished by 4:00 p.m. and was done in the rear of the business, out of sight of customers.

The criminal investigation was officially referred to the United States Department of Justice on September 10, 1999.

## II. DISCUSSION

Primarily, the defendant asserts that the warrants are deficient in both particularity and breadth, arguing that a review of the face of the warrants should lead us to find that there was no probable cause and that because the warrants do not incorporate by reference the Application and Affidavit, the Application and Affidavit were not part of the warrant. Defendant therefore moves to suppress all evidence seized from the execution of the two warrants, as they were allegedly in violation of the Fourth Amendment. U.S.C.A. Const. Amend. 4. He also argues that the agents showed extreme bad faith and reckless disregard for the law in that they: 1) ignored their own guidelines; 2) executed the warrants in a "reckless and barbaric fashion"; 3) "blatantly violated the requirements of Rule 41(d) (now 41(f))" of the Federal Rules of Criminal Procedure; 4) ignored the alleged requirement that they apply for and execute the warrants in a manner described by Directive 52; 5) "the fruits of these searches fueled a 'hybrid investigation' where agents abused liberal civil/administrative discovery process preceded by the most severe of criminal process (search and seizure)." M. to Suppress (Doc. 59) at 2. We have previously rejected a good portion of these allegations in our Opinion and Order dated October 14, 2004 (Doc. 71) and will not repeat those holdings here.

Typically, the proponent of a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated. *See United States v. Acosta,* 965 F.2d 1248, 1257 n. 9 (3d Cir.1992) (citing *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387(1978)). The standard of proof in this regard is a preponderance of the evidence. *See United States v. Matlock,* 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242,(1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance

of the evidence."). It is settled that at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely*, 6 F.3d 1447, 1452–53 (10th Cir.1993); *see also United States v. Matthews*, 32 F.3d 294, 298 (7th Cir.1994); *United States v. Cardona–Rivera*, 904 F.2d 1149, 1152 (7th Cir.1990); *Government of the Virgin Islands v. Gereau*, 502 F.2d 914, 921 (3d Cir.1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839(1975).

█ The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV. One's home is sacrosanct, and unreasonable government intrusion into the home is "the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment prohibits a general warrant. *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). A magistrate must determine that there is a "fair probability that ... evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The warrant must also describe the things to be seized with sufficient particularity and be "no broader than the probable cause on which is it is based." *United States v. Weber*, 923 F.2d 1338, 1342 (9th Cir.1990). Evidence seized in violation of the Fourth Amendment will be suppressed as "fruits of the poisonous tree." *Wong Sun v.*

*United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

█ At the outset we find that the affidavit presented to the magistrate provided a substantial basis for a finding of probable cause to search the premises in question and that there was a high probability that evidence of tax and conspiracy crimes would be found at both locations. We exercise only a deferential review of the initial probable cause determination made by the magistrate. *Gates*, 462 U.S. at 236, 103 S.Ct. 2317. Keeping in mind that the task of the issuing magistrate is simply to determine whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place," we are to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found. *Id.* The IRS had reviewed the defendant's tax returns from prior years, and found that he had declared decreasing amounts of business and personal income until the Center Company began filing nonresident alien income tax returns, when the defendant and his wife reported zero taxable income. We note that as a result of the mail covers which had been placed on the Leveto residence and business, it was known that both locations received mail from financial entities addressed to Dr. Leveto and Center Company; certain financial and personal expenditure information was sent to the residence. The Application and Affidavit also explain that the confidential informants confirmed the likely locations of financial records (home office with a computer, file cabinet and safe) as well as a computer at work. In addition the defendant had admitted to placing assets in a nominee name as well as having instructions on how "this whole process can be unwound" in a safe. Therefore, the Application and Affidavit set forth sufficient facts to show probable cause that the

defendant has violated 26 U.S.C. § 7201 and 7206(1) by failing to include his true business income. Evidence of a conspiracy to commit tax fraud in violation of 18 U.S.C. § 371 included the ongoing relationship between Dr. Leveto and Don Turner, Leveto's taped conversations reflecting his understanding and involvement in using the tax evasion methods set forth in Turner's book, including the use of offshore bank accounts.

 Dr. Leveto's challenge of the warrant is quite detailed and goes beyond the typical motion to suppress. As such, we note that although we view Dr. Leveto's challenge to the sufficiency of the warrants as being primarily legal in nature, we exercised our discretion and held a suppression hearing out of an abundance of caution. Fed.R.Crim.P. 12(b)(3)(c). The court shall conduct an evidentiary hearing when "at the very least, the factual dispute raised by [defendant's] moving papers and the government's response warrant an independent evidentiary hearing prior to trial." *United States v. Voigt*, 89 F.3d 1050, 1067 (3d Cir.1996). In order to raise such a factual dispute, the defendant's moving papers must demonstrate a "colorable claim" for relief. *United States v. Brink*, 39 F.3d 419, 424 (3d Cir.1994) (remanded for hearing where defendant alleged facts that, if true, could violate his constitutional rights). The burden is on the defendant to establish the necessity for the hearing. *United States v. Rodriguez*, 69 F.3d 136, 141 (7th Cir.1995). That burden can be met only upon the presentation of "definite, specific, detailed, and nonconjectoral facts." *Id.*

### A. Affidavits and Particularity

Dr. Leveto argues that the face of the warrant fails to establish probable cause

that a crime had been committed and that evidence of the crime would be located at the premises to be searched. He asserts that the warrants do not incorporate by reference the Application and Affidavit and therefore, the Application and Affidavit were not part of the warrant. The Application and Affidavit were reviewed and signed by the magistrate judge, and then sealed to protect the identities of the witnesses; however, the list of items to be seized was incorporated into the warrant and the warrant and such list was served upon the defendant at the time of the execution of the warrants.

As our court of appeals recently explained, the requirement of a particular description in writing accomplishes three things. "First, it memorializes precisely what search or seizure the issuing magistrate intended to permit. Second, it confines the discretion of the officers who are executing the warrant. Third, it 'inform[s] the subject of the search what can be seized.'" *Doe v. Groody*, 361 F.3d 232, 239 (3d Cir.2004) (citations omitted). In order to construe a warrant in light of an accompanying affidavit or other document that is incorporated within the warrant, the warrant must expressly incorporate that affidavit or document. *Id.* The only incorporated document in this case is Exhibit B, the list of items to be seized.

In support of his motion, Dr. Leveto relies in part on *Groh v. Ramirez*, 540 U.S. 551, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068 (2004), which, like any legal precedent, must be considered within the framework of its factual and procedural history. In *Groh*, a *Bivens* action,[3] a Special Agent for the Bureau of Alcohol, Tobacco and Fire-

---

**3.** *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

arms (ATF) prepared and signed an application for a warrant to search the Ramirez ranch, stating in the application that the search was for "any automatic firearms or parts to automatic weapons, destructive devices ... and any and all receipts pertaining to the purchase or manufacture of automatic weapons or explosive devices or launchers." *Id.* at 1288. The agent supported the application with a detailed affidavit, which he also prepared and executed, that set forth the basis for his belief that the listed items were concealed on the ranch. He presented these documents to a magistrate, along with a warrant form, and the magistrate signed the warrant form.

The problem was, the warrant described the items to be seized as "single dwelling residence ... blue in color," not as firearms. The Supreme Court held a warrant that did not describe, with particularity, the specific items to be seized was in violation of the Fourth Amendment, which the Court noted requires the warrant to *"particularly describing the place* to be searched and *the persons or things to be seized." Groh,* quoting U.S. Const. Amend IV, emphasis added by the Court. The Court noted:

> Although the **application** particularly described the place to be searched and the contraband petitioner expected to find, the **warrant itself** was less specific; **it failed to identify any of the items that petitioner intended to seize.** In the portion of the form that called for a description of the "person or property" to be seized, petitioner typed a description of respondents' two-story blue house **rather than the alleged stockpile of firearms. The warrant did not incorporate by reference the itemized list contained in the application.** It did, however, recite that the Magistrate was satisfied the affidavit established probable cause to believe that contra-

band was concealed on the premises, and that sufficient grounds existed for the warrant's issuance.

*Id.* at 1288 (emphasis added). Like the case at bar, the application and affidavit in *Groh* were sealed. The law enforcement officers later searched the premises, uncovered no illegal weapons or explosives, and when they left, the agent in charge gave to the respondent's wife a copy of the search warrant, but not a copy of the sealed application and affidavit. A day later, in response to a request form the respondent's attorney, the agent faxed the attorney a copy of the page of the application that listed the items to be seized. No charges were filed against the Ramirezes. The court held that "[t]he fact that the *application* adequately described the 'things to be seized' does not save the *warrant* from its facial invalidity." *Id.* at 1289. The court continued:

> The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents. And for good reason: The presence of a search warrant serves a high function, and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection. *We do not say that the Fourth Amendment forbids a warrant from cross-referencing other documents.* Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant. But in this case the warrant did not incorporate other documents by reference, nor did either affidavit or the application (which

had been placed under seal) accompany the warrant. *Hence, we need not further explore the matter of incorporation.*

*Id.* at 1289–90 (citations omitted) (emphasis added). Thus, the court ruled, in part, that an unattached and unincorporated affidavit and application were insufficient to cure a warrant describing the items to be seized as "single dwelling residence ... blue in color." 540 U.S. at –– ––––, 124 S.Ct. at 1289–90. With regard to the particularity of the warrant, the Court held that

> unless the particular items described in the affidavit are also set forth in the warrant itself (or at least incorporated by reference, and the affidavit present at the search), there can be no written assurance that the Magistrate actually found probable cause to search for, or seize, every item mentioned in the affidavit.

*Id.* at 1291.

One court has interpreted precedential value of *Groh* in the following way:

> [b]ecause the posture of the case in *Groh* obliged the Court to credit the homeowner's account that the officer only told her he was looking for "an explosive device in a box," *id.* at 1288, the Court did not address the officer's alleged attempt to cure the deficient warrant by explaining orally the objects of the search. The Court considered the officer's description "little better than no guidance at all." *Id.* at 1293. Because the warrant "did not describe the items to be seized *at all*" it was "so obviously deficient that [the Court] must regard the search as warrantless within the meaning of our case law." *Id.* at 1290.

*U.S. v. Katoa,* 379 F.3d 1203 (10th Cir. 2004).

Our own court of appeals, in *Doe v. Groody,* 361 F.3d 232 (3d Cir.2004), stated:

We recognize that there are decisions in which an affidavit has been used to save a defective warrant even when it has not been incorporated within that warrant. But the cases fall into two categories. The first embraces those circumstances in which the warrant contains an ambiguity or clerical error that can be resolved with reference to the affidavit.... Reliance on the affidavit in these circumstances neither broadens nor shrinks the scope of the warrant, but merely rectifies a minor irregularity.... *The second category of decisions in which an unincorporated affidavit has been read to modify a search warrant is constituted by cases in which the affidavit is particularized but the warrant is overbroad. So long as the actual search is confined to the narrower scope of the affidavit, courts have sometimes allowed the unincorporated affidavit to "cure" the warrant, or at least have treated the excessive elements of the warrant as harmless surplusage.*

*Id.* at 240 (emphasis added).

 We believe that the warrant in this case falls within that second category. Dr. Leveto has not come forth with any evidence that the actual search exceeded the narrower scope of the affidavit. Unlike *Groh,* the premises were adequately described. With the exception of the detailed descriptions of the two different locations to be searched, the two warrants are identical. One search warrant describes the premises to be searched as "the premises commonly known as Langdon & Leveto Veterinary hospital located at 316 Conneaut Lake Road (U.S. Rte. 322), Meadville, PA, which is a long, mostly one-story tan brick building, with a partial second floor containing a separate apartment"; the other describes the premises to be searched as "[t]he premises known as 388 Edgewood Drive, Meadville,

PA, which is a two-story light gray vinyl sided residence with attached garage and dark gray trim, located on the south west corner of the intersection of Edgewood Drive and Forest Avenue." Attachment A & B to the Government's Omnibus Response to Defendant Daniel Leveto's Pre-Trial Motions (Doc. 68).

We find that the descriptions of the items to be seized, which were attached and incorporated by reference to the warrants, are particular enough that the agents would have no difficulty discerning what should have been seized. *U.S. v. Humphrey,* 104 F.3d 65, 68–69 (5th Cir.), *cert. denied,* 520 U.S. 1235, 117 S.Ct. 1833, 137 L.Ed.2d 1038 (1997). It is important to note that the list of items to be seized was incorporated into the warrants and the warrants and such lists were served upon the defendant at the time of the execution of the warrants. The search warrants also identify that the warrant is issued to an agent of the IRS–CID and state that "there is now concealed a certain person or property, *namely the items listed on Exhibit B,* attached hereto and incorporated herein by reference; all of which are fruits and evidence of possible violations of Title 18, United States Code, Section 371." Attachment A & B to the Government's Omnibus Response to Defendant Daniel Leveto's Pre-Trial Motions (Doc. 68) (emphasis added). Exhibit B to the search warrants is entitled "ITEMS TO BE SEIZED" and is a single spaced, five paragraph description detailing the target of the seizure as being evidence which supports the allegation of "the obtaining, secreting, transfer and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money" or which showed financial relationship between Leveto and co-conspirators, among other things. Attachment C to the Government's Omnibus Response

to Defendant Daniel Leveto's Pre-Trial Motions (Doc. 68). Finally, the warrants include the following language just above the magistrate judge's signature:

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or property so described is now concealed on the person or premises above-described and establish grounds for the issuance of the warrant.

Attachments A & B to the Government's Omnibus Response to Defendant Daniel Leveto's Pre-Trial Motions (Doc. 68).

It is clear from the record that on the day that the magistrate signed both warrants, she also signed and sealed the Application and Affidavit; that Agent Lapina provided his affidavit to the magistrate judge for her review and discussion during his submission of the warrants to her. Attachment E to the Government's Omnibus Response to Defendant Daniel Leveto's Pre-Trial Motions (Doc. 68) at no. 5.

■■■■ It is the government's duty to serve the search warrant on the suspect, and the warrant must contain, either on its face or by attachment, a sufficiently particular description of what is to be seized. *Bartholomew v. Commonwealth of PA,* 221 F.3d 425, 429 (3d Cir.2000). We find that the government has adequately done so under these circumstances. *United States v. Hargus,* 128 F.3d 1358, 1362–63 (10th Cir.1997). The proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation. *United States v. Lacy,* 119 F.3d 742, 746 (9th Cir.1997). The warrants sufficiently memorialized what search or seizure the magistrate intended to permit, it confined the discretion of the executing officers, and it informed Dr. Leveto what was allowed to be seized. If the government needs to

keep an affidavit under seal in order to protect witnesses, it must list the items it seeks with particularity in the warrant itself. However, we must consider the practicalities of the situation and conclude that in a tax conspiracy case, still in the nascent stage of its investigation, a more detailed description might not be feasible. *United States v. Christine,* 687 F.2d 749, 760 (3d Cir.1982). Moreover, the government made no error in not limiting the warrant to only those fraud claims about which they had specific information. There is no requirement that the government agents know in advance the specific items of evidence to be seized or that the items seized do in fact evince a crime, so long as they are within the scope of a properly authorized warrant. *See Andresen v. Maryland,* 427 U.S. 463, 479–82, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). If the face sheet and attachments clearly state that the agents have lawful authority to conduct the search and specify the location to be searched and the items sought, the affidavit supporting the probable cause determination need not be served at the time of the search. *United States v. Celestine,* 324 F.3d 1095, 1101 (9th Cir.2003).

The face sheet and attachments provided Dr. Leveto with sufficient indicia of the agents' lawful authority to conduct the search, what and where they legally could search, and the crimes for which evidence was sought: The face sheet of the warrant clearly stated that a magistrate judge had found probable cause for the IRS–CID to conduct the search, thus indicating the agents' legal authority. The limits of that authority were set out by the attached list of items to be seized. This search involved protection of the identities of the under cover agents and confidential witnesses, and involved an allegedly ongoing conspiracy involving numerous corporations and individuals. The executing agents were well aware of the crimes at issue and the parameters of the search at the time of the execution of the search warrants. The warrants, list of items to be seized, and the application and affidavit clearly memorialize what search or seizure the issuing magistrate intended to permit. Records of the defendant's assets and expenditures during the period represent crucial evidence of his true income for purposes of violation of the tax laws. The items listed in the incorporated attachment included all financial records, writings and photos relating to the defendant's assets and expenditures; these records are important evidence in a situation where there is probable cause to believe that there was under reported income on income tax returns. The list of items also included all writings and photos dealing with co-conspirators and other entities allegedly involved in the scheme; the affidavit and application listed the names of individuals as well as details of how Leveto and Turner attempted to set up methods to conceal income from the government. The list of items to be seized included information concerning travel; the Lapina Affidavit explained how Dr. Leveto may have been concealing his assets in foreign bank accounts. We also note that the list of items to be seized included computer information; the Lapina Affidavit explains that the defendant used his business and personal computer to store personal financial information, which bears on his falsifying his income levels and tax returns.

Even if the warrant is deemed to be defective, the affidavit can save the defective warrant even though the affidavit has not been incorporated. *Doe,* 361 F.3d at 240. We find that the actual search was confined to the narrow scope of the affidavit, and thus, the unincorporated affidavit permissibly cured an arguably overbroad warrant. *Id.*

### B. Overbreadth

 To determine whether a warrant was overbroad, we must compare the scope of search and seizure authorized by the warrant with the ambit of probable cause established by the supporting affidavit. *In re Impounded Case (Law Firm)*, 840 F.2d 196, 200 (3d Cir.1988). In doing so, "the phrases in a search warrant must be read in context and not in isolation." *United States v. Conley*, 4 F.3d 1200, 1208 (3d Cir.1993). When a warrant is challenged as overbroad, the issue is whether there exists probable cause to support the breadth of the search that was authorized. Probable cause is a "practical, nontechnical concept." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). It cannot be "reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232, 103 S.Ct. 2317. As the Supreme Court has observed, a "commonsense, practical" review of the "totality of the circumstances" is necessary to determine whether "in a particular factual context the probability of criminal conduct has been established." *Id.* at 230, 103 S.Ct. 2317. Thus, in determining whether a warrant authorizing seizure of large numbers of documents or other items is properly supported by probable cause and is thus not overbroad, a court must consider the "totality of the circumstances" in the particular case at hand.

 In this case, the magistrate was presented with evidence of a pervasive and complex tax scheme by Dr. Leveto to create sham corporations and off-shore accounts. According to information presented, the deception of the IRS was not limited to the defendants' control over numerous nominee corporations, but included his own personal returns. Thus, information was presented setting forth probable cause to believe that Dr. Leveto was substantially underreporting his own income. The affidavit fairly can be read as setting forth probable cause to believe that the entire business conducted from the Leveto business was one "permeated with fraud," a showing which justifies seizing all the business record on the premises. *United States Postal Service v. C.E.C. Services*, 869 F.2d 184, 187 (2d Cir.1989); *National City Trading Corp. v. United States*, 635 F.2d 1020, 1024–26 (2d Cir.1980).

Even if the information in the affidavit falls short of showing a completely fraudulent operation, however, we conclude that it provides sufficient support for seizure of the broad array of documents set forth in the warrant. The Court reaches this conclusion based upon the following considerations. First, the affidavit presented information that Dr. Leveto, with the help of Don Turner, was operating a complex and far-reaching tax fraud enterprise. In such instances, a search warrant cannot confine the documents to be seized merely to those which plainly describe the alleged criminal activity. Instead, in order to "reconstruct defendants' true financial and tax picture, evidence regarding legal as well as illegal transactions may be necessary" to show a violation of the federal tax laws as well as the extent of any possible violations of those statutes. *United States v. Frederickson*, 846 F.2d 517, 519–20 (8th Cir. 1988). Thus, in this case, where the affidavit provided information concerning a number of schemes to evade and avoid income taxes, a warrant authorizing seizure of papers documenting both legal and illegal transactions was necessary in order to obtain a clear picture of the defendants' activities.

In particular, evidence that Dr. Leveto was significantly underreporting his income and failing to indicate on his tax returns the sources of much of his income made a warrant authorizing the seizure of

even apparently legitimate business records a necessity. In order to attempt an even remotely accurate estimate of Dr. Leveto's income and its sources, the agents needed a wide variety of records including those specified in the items to be seized. Hence, the nature of the allegations underlying the warrant necessitated the seizure of seemingly innocuous but nonetheless telling documents. Moreover, the complex nature of defendants' alleged activities to defraud the IRS, which involved numerous tax returns and financial transactions, necessitated a search warrant for large numbers and classes of documents.

Further, in a case such as this, where information in the affidavit demonstrates that the defendants were perpetrating a number of tax fraud schemes, which by their nature would involve many documents, a warrant cannot be so narrow that it requires executing agents to conduct a lengthy, on-site examination of the documents in order to separate evidence of legal transactions from evidence of illegal transactions. As one court stated: "If the search warrant had required the executing agents to first determine whether the seized materials related to one of the suspected criminal activities or could conceivably have assisted in proving one of the suspected criminal activities, they would probably still be on the premises. Even a trained expert in ... federal income taxation could not have reasonably discerned on the spot which of the myriad documents would prove to be valuable to a possible government prosecution." *United States v. Regan*, 706 F.Supp. 1102, 1114 (S.D.N.Y. 1989). And as the Eleventh Circuit has observed when faced with this question:

> It was inevitable that some irrelevant materials would be seized as agents searched through numerous documents for evidence of tax evasion and failure to file, crimes that are generally only de-

tected through the careful analysis and synthesis of a large number of documents. Indeed, it might have been far more disruptive had the agents made a thorough search of each individual document ... before removing it from [the defendant's] home and office. To insist on such a practice would substantially increase the time required to conduct the search, thereby aggravating the intrusiveness of the search.

*United States v. Schandl*, 947 F.2d 462, 465–66 (11th Cir.1991), *cert. denied*, 504 U.S. 975, 112 S.Ct. 2946, 119 L.Ed.2d 569 (1992). To require agents to sift through the myriad of documents in this case on site would have taken a long time and would have subjected the defendants to an intolerable intrusion.

Accordingly, in light of the complex nature of the schemes alleged, the necessity of seizing many documents in order to piece together an accurate picture of the defendants' activities and the obvious impracticality of requiring agents to make on the spot determinations as to which documents contained evidence of illegality and which did not, the Court is persuaded that the search warrant in this case was not so overbroad as to be invalid. The affidavit was as specific as it could have been under the circumstances. *United States v. American Investors, Inc.*, 879 F.2d 1087 (3d Cir.1989) (warrants for business records should be a sufficiently particular to meet constitutional requirements as the available information permits); *United States v. Henson*, 848 F.2d 1374 (6th Cir. 1988) ("the degree of specificity required is flexible" and depends upon the circumstances), *cert. denied*, 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989). We find that the categories of documents specified were not so broad as to exceed the scope of the crime under investigation. The Application and Affidavit states that

the defendant and others conspired to commit violations of Sections 7201 and 7206(1) of Title 26; it sets forth probable members of the conspiracy and overt acts in furtherance thereof. The seizing agents were well aware of the scope of the conspiracy at the time of the execution of the warrants.

### C. Good Faith Exception

In any event, although this court need not reach the question, the agents clearly acted in good faith and thus, the good faith exception to the exclusionary rule applies. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *United States v. Hodge*, 246 F.3d 301 (3d Cir.2001), the "test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 301, *quoting United States v. Loy*, 191 F.3d 360, 367 (3d Cir.1999). And "[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *Hodge*, 246 F.3d at 307–08, *citing Leon*, 468 U.S. at 922, 104 S.Ct. 3405, and *United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993). The good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law and all the known facts. *United States v. Reilly*, 76 F.3d 1271, 1273 (2d Cir.1996). We find that, in this case, the factors cited above were present. The agents conducted an extensive investigation, including the use of an undercover agent, prior to seeking a search warrant. Special Agent Lapina submitted to the prosecuting attorney a detailed affidavit setting forth persuasive evidence, gleaned as a result of the investigation, that there was probable cause to conduct the search. The affidavit was submitted to Magistrate Judge Baxter, who reviewed it and the warrant, and determined that there was probable cause to search for the broad array of documents sought. Accordingly, the agents were entitled to rely on the warrant as issued unless it was patently obvious to the agents that the search was illegal despite the Magistrate's authorization of it. Whether the warrant in this case is facially overbroad at best presents a debatable legal question.

The Court therefore cannot say that the warrant is the type that announces itself to an executing agent as plainly overbroad. Instead, the Court believes the warrant contained elements that would signal to an executing officer that it was valid. An officer's reliance on a warrant would not be reasonable if: 1) the warrant was issued in reliance on a deliberately or recklessly false affidavit; 2) the magistrate had abandoned her judicial role and failed to perform her neutral and detached function; 3) the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or 4) the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. *Hodge*, 246 F.3d at 308. The standard to be used when reviewing a probable cause finding by a magistrate judge has been explained as follows:

> When faced with a challenge to the magistrate's probable cause determination, a reviewing court must remember that its role is limited. It is not to conduct a *de novo* review. Rather, it simply ensures that the magistrate had a substantial basis for concluding that probable cause existed.

*United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir.1993). Moreover, a magis-

trate may find probable cause "when, viewing the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Hodge*, 246 F.3d at 305.

We find that it was not "entirely unreasonable" to believe there was probable cause and that there was a "fair probability that contraband or evidence of a crime [would] be found on the premises." The magistrate had a "substantial basis" for determining that probable cause existed.

 As to number (4) of the delineated exceptions listed above, not only must the magistrate judge have erred, but her error must have been so obvious that a law enforcement official should have realized the mistake just by reading the warrant. The Fourth Amendment requires that search warrants particularly describe the place to be searched, and the persons or things to be seized. *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987). A warrant particularly describes the place to be searched "if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended." *United States v. Bedford*, 519 F.2d 650, 655 (3d Cir.1975). Clearly, the warrant in this case, with the attached referenced list of items to be seized, particularly described the places to be searched; the description of the items themselves was sufficiently particular that the face of the warrant could not be said to be deficient. We therefore uphold the warrant here.

Dr. Leveto argues that the agents acted in bad faith and that the good faith exception of *Leon* should not apply because the IRS agents violated their own internal guidelines (arguments previously rejected by us) as well as allegedly violated the requirements for the issuance of summonses to third parties. 26 U.S.C. §§ 7602, 7609. It is clear that the administrative summonses served by the IRS–CID were accompanied by the appropriate notice to Dr. Leveto and that no administrative summonses were issued in the investigation after the administrative criminal tax investigation was referred to the U.S. Department of Justice on September 10, 1999. We therefore reject this argument.

## III. CONCLUSION

For the foregoing reasons, defendant's motion to suppress is denied. An appropriate order follows.

### ORDER

AND NOW, to-wit, this day _____ of November, 2004, it is hereby ORDERED, ADJUDGED AND DECREED THAT defendant's "Motion to Suppress Evidence" (Doc. 59) be and the same is hereby DENIED.